**Affirmed and Opinion Filed May 7, 2014**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-11-01119-CV

**IMAGINE AUTOMOTIVE GROUP, IMAGINE AUTOMOTIVE GROUP, I., L.P., ECARLINK, L.P., ECARLINK GP, INC., BRETT STACY, AND LEN CRITCHER, Appellants**

**V.**

**BOARDWALK MOTOR CARS, LTD. D/B/A BOARDWALK PORSCHE, BOARDWALK AUTOMOBILES, LTD. D/B/A BOARDWALK AUDI, AND BOARDWALK TRANSPORTATION, L.P. D/B/A BOARDWALK VOLKSWAGEN, Appellees**

**On Appeal from the 296th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 296-982-07**

## OPINION

Before Justices FitzGerald, Francis, and Fillmore
Opinion by Justice Francis

The trial court struck the pleadings of Imagine Automotive Group, Imagine Automotive Group, I., L.P., eCarLink GP, Inc., Brett Stacy, and Len Critcher as a sanction for discovery abuse. A jury then determined damages. The trial court rendered judgment awarding actual damages and attorney's fees to appellees Boardwalk Motor Cars, Ltd. d/b/a Boardwalk Porsche, Boardwalk Automobiles, Ltd. d/b/a Boardwalk Audi, and Boardwalk Transportation, L.P. d/b/a Boardwalk Volkswagen (collectively, Boardwalk) on their cause of action under the Texas Theft

Liability Act.[1] The trial court also awarded additional attorney's fees as sanctions against appellants.

In multiple issues, appellants challenge the trial court's sanction order, alleged errors in the jury charge,[2] and the trial court's award of attorney's fees. For the reasons set out below, we conclude the issues are without merit. We affirm the trial court's judgment.

## BACKGROUND

All of the parties are in the business of selling cars. Appellees are three of the new and used car dealerships operated under the name "Boardwalk" by their owner Scott Ginsburg. In their operative petition, appellees allege that appellants Brett Stacy and Len Critcher were involved in the business of selling used cars and purchasing cars for resale using the names "Imagine Auto Group" and "eCarLink." The record also revealed that Critcher had expertise in the business of selling cars through the internet.

This case began in March 2007 when Boardwalk sued its former president, Robert Rodriguez. Boardwalk alleged that Rodriguez had embezzled funds from its car dealerships. Several months later, Boardwalk joined appellants as defendants. At the time of trial, Boardwalk claimed that appellants bribed Boardwalk employees to obtain used cars at preferential prices. Boardwalk asserted that appellants would then resell the cars at a profit. Boardwalk also alleged that appellants stole cars from its dealerships, and were therefore liable for damages under the Texas Theft Liability Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 134.001–134.005 (West

---

[1] The trial court's judgment lists appellees, the plaintiffs below, as "Boardwalk Motor Cars, LLC, Boardwalk Automobiles, LLC, and Boardwalk Transportation, LLC," consistent with the operative Twelfth Amended Petition. The appellate briefs, however, list appellees as designated in the above caption, and also show that Boardwalk Motor Cars, Ltd. was formerly known as "The Porsche Store," and Boardwalk Automobiles, Ltd. was formerly known as "The Audi Store." At trial and on appeal, the parties referred to appellees collectively as "Boardwalk."

[2] All of the appellants, except Critcher, are represented by the same counsel on appeal and filed a joint brief raising five issues. Critcher filed a separate brief raising twelve issues. Despite their separate counsel, throughout trial and on appeal, all parties referred to all appellants, including Critcher, as the "Stacy Defendants" or the "Stacy Appellants." Our references to "appellants" generally include Critcher. All appellants have adopted each other's issues and incorporated them into their briefing.

2011 & Supp. 2013) ("TTLA") (person who commits theft is liable for damages resulting from the theft).

To establish these claims, Boardwalk sought to discover any payments made by appellants to Boardwalk's employees. Boardwalk also sought to discover whether appellants had paid for cars obtained from Boardwalk. Boardwalk's attempts to obtain appellants' financial records led to protracted disputes in the trial court. The parties' disputes and the trial court's sanctions centered around four categories of documents: (1) appellants' bank records, including cancelled checks, showing payments to Boardwalk employees or payments for cars; (2) appellants' financial records kept in an accounting software program called "QuickBooks;" (3) electronic "Common Gateway Interface" data kept internally by appellants (referred to by the parties as the "CGI documents"); and (4) evidence supporting appellants' defense that they had paid for eleven cars Boardwalk contended had been stolen.

The week before trial, the trial court struck appellants' defenses to Boardwalk's commercial bribery claim for failures to produce documents in the first two categories. On the third day of trial, the trial court struck the remainder of appellants' pleadings for failure to produce documents in the third category. During trial, the trial court excluded all of the evidence in the fourth category, including documents and the testimony of several witnesses.

The record shows discovery began at least two years before trial. On May 7, 2008, appellants responded to Boardwalk's Second Request for Production. In request number four, Boardwalk sought documents regarding "every vehicle or vehicle transaction" between appellants and Boardwalk.[3] Although appellants objected to this request as overly broad, unduly

---

[3] Request number 4 in its entirety provides:

> All documents that reflect or evidence every vehicle or vehicle transaction the Stacy Defendants had with any dealership in the Boardwalk Auto Group or with any employee, officer or agent of the Boardwalk Auto Group dealerships, including without limitation documents that contain the date of acquisition, acquisition price, status of inventory, date of transfer between or among the Stacy

–3–

burdensome, not reasonably calculated to lead to the discovery of admissible evidence, and requiring the creation of documents not already in existence, appellants also responded that "[d]ocuments reflecting wholesale vehicle transactions between the corporate [appellants] and Plaintiffs have already been made available to Plaintiffs for review at the offices of [appellants'] counsel." In request number 67, Boardwalk sought "[a]ll documents that reflect or evidence each check or money order or receipt for cash received from or paid to any of the Boardwalk dealerships or any employee of the Boardwalk dealerships by any of the [appellants] or on their behalf for any transaction made the basis of this suit." Appellants did not object to this request, and responded, "[d]ocuments that are responsive to this Request have already been made available to Plaintiffs for review at the offices of [appellants'] counsel." In its May 23, 2011, Order on Plaintiffs' Motion for Sanctions (the "Sanctions Order"), the trial court found that appellants "withheld and concealed the existence of documents" responsive to these two requests.

In October 2008, Boardwalk filed a motion to compel, alleging that appellants had failed to produce cancelled checks, records of cash withdrawals for payments to Boardwalk, and credit card records. After two hearings, the trial court ordered appellants in January 2009 to produce three categories of documents: (1) "Defendants' file copies of checks (voucher checks) pertaining to vehicles purchased from Plaintiffs; (2) "deal jackets"[4] on five specific Porsche trade-ins; and (3) "all cancelled checks, withdrawals of cash, credit card chits, American Express chits and wire transfers pertaining to vehicles purchased from Plaintiffs."

---

Defendants, the price or value attributed to the amount exchanged for the vehicle, the form of payment or price or value of the exchange, and date of disposition to someone other than the Stacy Defendants, disposition price and profit or loss recognized by any of the Stacy Defendants involved in any of the transactions, the identity of the third parties involved in any final disposition of the vehicle and the identity. When describing each vehicle, be specific enough so that a third party could identify the vehicle, such as make, model and vehicle identification number.

[4] As explained in appellants' brief, "deal jackets" are files that "include materials related to the sale of a vehicle."

Two weeks later, Boardwalk filed a "Motion to Enforce Order Compelling Production of Cancelled Checks," alleging that appellants' production of copies of approximately 350 cancelled checks was incomplete. In their response, appellants averred that "[a]t the present time, the Imagine Wholesale Defendants have produced all of the payment records for vehicles of which they are aware," and promised to supplement if additional records were identified.

In late February, the trial court appointed an auditor to "determine (1) whether the Imagine Wholesale Defendants purchased a motor vehicle from Plaintiff dealerships as alleged by Plaintiffs, (2) whether clear title was timely tendered by the Plaintiff dealerships on such alleged purchase, and (3) whether payment was made or timely made by the Imagine Defendants on any timely cleared transaction." The auditor issued a report in June 2009, and was able to confirm payment for all but approximately twenty of the 256 cars that were the subject of the audit. At the time of trial, this number had been reduced to eleven.

Also that summer, Boardwalk filed additional motions to compel, seeking records from nonparty Sterling Bank for an entity called "Magic Imports" and additional responsive documents from appellants. Boardwalk stated that appellants had recently claimed the transactions at issue were with Magic Imports, not appellants. The court granted the motion for Sterling Bank records.

After an unsuccessful attempt to settle the case, the parties' discovery disputes continued in 2010. At a January hearing, Boardwalk contended that when the records were produced by Sterling Bank, it "discovered that there were checks written and relationships between the Imagine Auto Group and Magic Imports that involved Boardwalk vehicles, and those records have not been produced." Boardwalk also sought records from Frost Bank regarding the eleven cars for which the auditor could not confirm payment. The hearing was adjourned for the trial court to consider granting a continuance based on the indictments of Stacy and Myachelle

Monarch, appellants' bookkeeper. The court denied the continuance the following day, and set the trial date for February 8.

Shortly thereafter, all of the appellants obtained new counsel of record. Appellants' prior counsel, Ralph Perry-Miller and Brent Dyer of Looper Reed & McGraw (Looper Reed), withdrew as counsel of record. The court granted appellants' motions to substitute counsel on January 20.

In a hearing on February 5, Boardwalk stated it had recently obtained bank records that had been filed with the District Attorney's office in connection with the criminal prosecution of Stacy. Boardwalk argued the bank records "demonstrate they [appellants] were bribing our employees." After an off-the-record conference in chambers, the trial court found "that the Stacy Defendants . . . did not accurately or properly respond to the discovery request, most specifically a request asking for all documents that show payments made from Mr. Stacy to any and all employees of Boardwalk Motors." The court noted that because the response was not adequate, Boardwalk was precluded from pleading additional causes of action in time for the February 8 trial setting. In addition, the court stated that counsel had reached an agreement "with regard to how we are going to move on from here on a very, very limited basis, based upon the newly acquired evidence over the last several days." The parties agreed to the following: (1) appellants would produce "the bank records for the Imagine, eCarLink defendants from January 1st, 2003 through March of 2007," (2) Boardwalk would amend its pleadings with any new claims that arose from the production of those records; (3) Boardwalk would produce for limited deposition any Boardwalk employee covered by the payments; (4) appellants would allege any new defenses limited to the new pleadings; and (5) appellants would appear for depositions on the same limited basis. The court then specially set the case for jury trial on May 3, 2010.

On March 10, Boardwalk moved for sanctions and for orders to show cause against appellants and their former counsel, alleging "that documents, check records and other relevant evidence in this case were concealed and misrepresented" through perjured testimony, false discovery answers, direct misstatements to the court, and improper influence of witnesses. Orders to show cause were issued to Stacy and Critcher the following day. Appellants' former counsel filed a response and objection, as did Critcher.

A "Partial Order in Response to Order to Show Cause" dated April 14, 2010, recites that a hearing was held on March 22, 2010, "on whether this Court should take action in response to designated conduct" of appellants' former counsel. The appellate record does not include a transcript of this hearing. The court found former counsel's conduct ethical and declined to impose sanctions.

Shortly after the March 22 hearing, the trial court signed an order regarding the matters addressed at the February 5 hearing. This order expressly states that "Defendants have satisfied the Rule 11 Agreement entered into between the parties securing Defendants' bank records and discovery as covered by the February 5, 2010, agreement placed in the record of the Court." The order also set dates for the depositions of eight witnesses.

On April 8, less than thirty days prior to trial, appellants sent a seventeen-page "supplemental production" to Boardwalk's counsel. Nineteen days later, Boardwalk moved to strike this production, alleging that it was untimely. According to the motion to strike, the supplemental documents were "proffered as evidence to refute Plaintiffs' claims that the Defendants never paid for a number of cars they obtained from the Boardwalk dealerships." Boardwalk argued that the auditor's supplemental report of July 29, 2009, had identified these cars almost nine months prior to the supplementation, so that the supplementation was untimely.

On April 12, Boardwalk filed an amended motion for sanctions. Boardwalk alleged that appellants had engaged in "a pattern and history of bad faith discovery abuse," among many other complaints. This motion was heard on April 21. At the outset of the hearing, the trial court voiced its concerns about representations made by former counsel for appellants regarding bank records sought by Boardwalk in discovery. In comments to counsel for appellants, the trial court stated:

> So what [Boardwalk] asked for were any documents to show any payments between your clients and any of the Plaintiffs or Plaintiffs' employees, that is as broad as that, and those were argued to – well, they were answered that there were none; and then too, when they didn't – I think when the Plaintiffs didn't believe that, what they did is they subpoenaed the third party, which your client filed a motion to quash, and the attorneys for your clients argued over and over and over again . . . that, Judge, they have nothing to do with it and they are a fishing expedition, which I sustained the objections based upon those representations and they were not produced.

Counsel for appellants then argued that the payments were "buyer transaction fees," not bribes. The court responded, "[t]hat is not for me to decide, that's not for you to decide, it is not for your clients to decide. It is for the jury to decide what those payments were for." The court continued, "The question is, did [appellees] have a right to have those documents in preparation for their case and not be fought against by officers of the Court on behalf of their clients representing to the Court that they were not relevant to the case; that they've been through them all, Judge, and this is merely a fishing expedition, there are none that exist. That's the question." The court continued, "[a]nd not until later, I think the eve before our last trial date, did we find these payments that existed and that is yet why we are here." The court also noted that appellants and their former counsel were each implicating the other in the failure to produce documents, and stated, "[s]omebody isn't telling the truth."

The court heard testimony from six witnesses and admitted numerous exhibits into evidence. Boardwalk called Stacy to testify. He was questioned about copies of twelve Frost National Bank checks from Imagine Automotive Group or eCarLink to current or former Boardwalk employees. Stacy admitted the checks had not been produced by appellants in discovery. Monarch also testified. She explained that she was the person responsible for providing appellants' counsel with documents responsive to requests for production and testified at length about her efforts.

At the conclusion of the hearing, the trial court ruled that appellants had not fully complied with discovery requests that were served on them. As an example, the court cited "QuickBook records that indicate checks were made to Boardwalk employees" that had never been produced. The court also stated that there were tax forms, including 1099 forms and W-4 forms "that would reflect payments made to Boardwalk employees or otherwise responsive" to discovery requests that had not been produced. The court therefore ordered:

> Because we didn't get them, I am not – I am not pleased by it, to say the least. Okay? So we are going to do some things and I am going to order you [Monarch] to do it, okay? First of all, you are not to touch the computer that houses the QuickBooks until something happens, and that something is that we are going to send this forensic computer expert to your office at a time that's mutually agreeable to all of the parties to take an image of the hard drive – well, of the hard drive that contains QuickBooks. Nothing else off of that computer is to be imaged.

In addition, the court ordered production of "1099s and W-4s, W-2s, tax returns that list [Boardwalk employees] as person who received payment, if that's part of your tax return." The computer was to be imaged the following morning, and a deposition of Monarch was to follow. The court warned Monarch that she could be held in contempt if she did not follow its orders.

The court then made findings on the record. The court found that "the Defendants have failed to respond in accordance with the Texas Rules of Civil Procedure to certain requests for

production served on the Defendants by the Plaintiffs." As a result of this failure, "this case has been delayed, has resulted in unnecessary hearings and use of court time and has resulted in the expenditure of significant attorney's fees." The court found "that such noncompliance with the Rules has prejudiced the Plaintiff[s] and their ability to not only prosecute their claims but defend any and all counterclaims." The court stated that it would "entertain the imposition of the payment of attorney's fees" relating to the motion to compel and failures to comply with discovery. The court noted that the parties had agreed to reserve the hearing on the amount of attorney's fees until after the jury trial set for May 3.

The trial court took Boardwalk's motion to strike appellants' defenses to the commercial bribery claim under advisement, explaining "the Court does not take lightly its obligations under the case law to reserve death penalty sanctions for the most egregious of actions and behaviors and disregard of the rules." The court commented, "[t]o say that I am disappointed, I have to say this is the worst case that I have dealt with with regard to the noncompliance with discovery. The worst." The trial court stated that it was considering striking the pleadings.

On April 26, Boardwalk filed a second supplemental motion for sanctions, alleging that the April 22 production of QuickBooks files revealed misrepresentations made to the court by appellants through their counsel. Boardwalk alleged the production revealed that there was no need for a court-appointed auditor, and that appellants had made false and misleading statements about the existence of documents and frivolous objections to discovery requests. And as noted above, the following day, Boardwalk filed a motion to strike appellants' April 8 supplemental production.

Boardwalk's motion for sanctions was heard at the pretrial hearing on April 30. Again, Monarch testified. The trial court then called appellants' former counsel as a witness, and questioned him extensively about appellants' discovery responses, the failures to produce

–10–

documents, his awareness of the existence of responsive documents, and his communication with appellants about responding to discovery. Boardwalk requested that the trial court strike appellants' defenses to Boardwalk's commercial bribery claim, arguing that "had the discovery responses in the fall of '07 been what they should have been" regarding payments made to Boardwalk employees, then Boardwalk's pleadings, discovery, and exhibits would have been different, and Boardwalk would "be going to trial on a different case."

The court held an extensive discussion with counsel during closing arguments, considering whether lesser measures had been taken to obtain compliance with discovery rules and reviewing the history of the pretrial proceedings. The court emphasized that because appellants had, without objection, answered request for production 67 that all documents showing payments to Boardwalk employees had already been produced, there was no reason for Boardwalk to file a motion to compel or attempt to obtain court orders requiring production. The court explained that when lawyers make representations in a pleading, "we take them at their word," and the representation was that all documents had been produced. The court also noted that if had it granted appellants' no-evidence motion for summary judgment, "this case would have ended to your client's benefit and to the detriment of the plaintiff[s] because they didn't have all the information. . . .[W]e can't get to the truth until we have all the information." The court also mentioned its appointment of an auditor when appellants had documents in their possession that would have made the audit unnecessary. The court also emphasized that Stacy had been present in the courtroom to hear his attorneys make representations to the court about "the existence or nonexistence of certain documents" that were not true.

The court granted Boardwalk's request to strike appellants' defenses to the commercial bribery claim. In explaining the basis for the ruling, the court found that appellants "failed to in good faith comply with the Texas Rules of Civil Procedure with regard to discovery;" made false

representations to the court; caused the unnecessary appointment of an auditor who was not able to complete his job; and "restricted significantly" Boardwalk's ability to develop its case. The court attempted to remedy the prejudice to Boardwalk by granting a continuance and allowing additional discovery, but "those efforts by the Court were to no avail," and "it took the Court to threaten contempt upon the defendants" to obtain their compliance. The court found that a continuance would not "be fruitful," as the cost of resetting the case and reopening discovery would be "enormous and great," and would not be "an equitable way to resolve the discovery abuse by the defendants."

The case proceeded to trial before a jury. On the third day of trial, outside the presence of the jury, Boardwalk's counsel informed the trial court of yet another failure by appellants to produce responsive discovery, this time the CGI documents. The trial court read the discovery request at issue, reviewed its prior rulings, heard testimony from Critcher and Monarch about the CGI database and what information was included, and concluded that information responsive to the requests for production was included in the CGI database but had not been produced by Critcher or any other appellant. After an explanation of its reasoning, the trial court struck appellants' pleadings.

The jury's task was then reduced to determining Boardwalk's damages caused by appellants' admitted wrongful conduct. The charge to the jury included instructions that appellants were liable for participating in breaches of fiduciary duty by Boardwalk's employees, violation of the TTLA, conversion, and failure to pay sales tax. The jury was asked to find damages, if any, on these causes of action. The jury awarded $77,128.57 as damages for breach of fiduciary duty and $269,950 as damages under the TTLA. The jury awarded zero damages on the remaining questions.

Three post-trial hearings were held. Boardwalk elected the higher recovery under the TTLA. The court granted a settlement credit of $10,000, and heard detailed testimony to support Boardwalk's requests for attorney's fees related to the TTLA claim and related to the sanctions imposed by the trial court. The trial court also held an evidentiary hearing to determine whether appellants, their prior counsel, or both should be liable to pay the sanctions awarded. In a memorandum to counsel after the hearing, the trial court explained that "[a]s a result of the evidence presented, the Court is unable to specifically separate the discovery abuses that took place during the case as between the Defendants and their previous counsel." The court therefore "applied an appropriate reduction" to the amount of the sanction imposed on appellants, but declined to impose sanctions on prior counsel because Boardwalk "failed to request or obtain a ruling for discovery abuse specific to [Looper Reed] prior to the commencement of trial."

The trial court rendered judgment for Boardwalk in the amount of $259,950 under the TTLA for appellants' theft of eleven cars. The judgment also awarded Boardwalk $389,898 in attorney's fees. *See* TTLA § 134.005(b) (person who prevails in TTLA suit shall be awarded court costs and reasonable and necessary attorney's fees). The trial court also awarded appellees costs of court, including costs of the court-appointed auditor and two mediators. *Id.* And as a sanction for discovery abuse found before trial, the trial court awarded an additional $180,000 in attorney's fees to Boardwalk, to be paid by appellants but not their prior counsel. This appeal followed.

## DISCOVERY SANCTIONS

In their first three issues, appellants complain that the trial court failed to consider or assess lesser sanctions before striking their pleadings; failed to allow appellants to offer evidence relating to causation; and erred by assessing sanctions only against appellants and not against

–13–

their counsel. In his first four issues, Critcher challenges the trial court's sanctions, alleging that there is no evidence he committed any sanctionable conduct; the sanction was inappropriate, unjust, and not related to any sanctionable conduct attributable to him; and the monetary sanction assessed against him was unduly vague. Critcher does not present any argument or authorities to support his contention that the sanction assessed against him was unduly vague. We therefore overrule his fourth issue. *See* TEX. R. APP. P. 38.1(i) (appellant's brief must contain clear and concise argument for contentions made, with appropriate citations to authorities and to the record); *Denmon v. Atlas Leasing, L.L.C.*, 285 S.W.3d 591, 597 (Tex. App.—Dallas 2009, no pet.) (assertions of error without argument, authority, or citation to the record waive error).

We review a trial court's imposition of sanctions for an abuse of discretion. *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991) (orig. proceeding). We review the entire record, including the evidence, arguments of counsel, written discovery on file, and the circumstances surrounding the party's discovery abuse. *Response Time, Inc. v. Sterling Commerce (N. Am.), Inc.*, 95 S.W.3d 656, 659 (Tex. App.—Dallas 2002, no pet.).

We note that although the appellate record exceeds 10,000 pages, it does not include transcripts from several hearings referenced in the trial court's sanctions order,[5] the parties' briefs,[6] or other portions of the record.[7] We have no record of a late 2008 or early 2009 hearing at which appellants' then-counsel apparently represented to the trial court that there were no

---

[5] The trial court's "Order on Plaintiffs' Motion for Sanctions" dated May 23, 2011, begins with a recitation of three hearing dates, including March 22, 2010. The appellate record does not include a transcript from this date. The trial court's order also references an order of October 7, 2008; the record indicates there was a hearing on this date but no transcript is included in our record. (The trial court's order also references a hearing on March 4, 2010, but the appellate record includes a transcript from March 4, 2011. We assume the trial court intended to reference the 2011 hearing.)

[6] Boardwalk's brief indicates that there was a hearing on February 10, 2010, and there are numerous references to a hearing on that date in the transcript from a hearing on April 21, 2010, but the appellate record does not include a transcript from that date.

[7] The record contains numerous references to the October 2008 hearing. At one of the post-trial hearings, the parties and the trial court discuss arguments made at a discovery hearing on January 13, 2009. In addition, the April 21, 2010, hearing transcript refers to testimony taken "at the last hearing." The "last hearing" transcript in the appellate record before April 21, 2010, is dated February 5, 2010, and is not evidentiary.

–14–

responsive documents in appellants' bank records. This hearing was especially significant because the trial court referenced counsel's statement on numerous occasions as an important factor in the imposition of sanctions.[8] And at a sanctions hearing held in April 2010, the parties and the court reference testimony that was apparently taken at a hearing in February or March 2010, of which we have no record.[9]

Similarly, the appellate record contains only the original petition, which asserts no claims against any of the appellants, and the twelfth amended petition, filed on the first day of trial. Consequently, we have no record of the claims that were asserted against appellants at the time the discovery disputes arose. *See* TEX. R. CIV. P. 192.3(a) (providing that party may obtain discovery of matters "relevant to the subject matter of the pending action, whether it relates to the claim or defense of the party seeking discovery or the claim or defense of any other party").

Appellants did not attempt to supplement the record, did not argue that any portion of the record had been lost or destroyed under Texas Rule of Appellate Procedure 34.6(f), and did not designate a partial reporter's record under rule 34.6(c). *See* TEX. R. APP. P. 34. Without these portions of the record, we are left with an incomplete record on appeal. When confronted with an incomplete record, we presume the omitted portions are relevant to the appeal and the evidence contained within the omitted portions of the record support the trial court's judgment. *See Davis v. Kaufman Cnty.*, 195 S.W.3d 847, 851 (Tex. App.—Dallas 2006, no pet.);

---

[8] For example, the trial court's May 23, 2011 sanctions order includes a finding that "[t]he Court placed significant restrictions on Plaintiffs' ability to obtain bank records and other financial documents based upon representations by Defendants through their counsel, that such records had been reviewed and no documents existed which were relevant to the issues involved in the litigation or that were responsive to the various discovery requests."

[9] The trial court attached significance to the presence of appellants Stacy and Critcher at these pretrial hearings in concluding that they personally were aware of the documents that were sought and the discovery disputes from which the sanctions arose; without a record, we must presume the evidence supported this conclusion.

*McFarland v. Szakalun*, 809 S.W.2d 760, 764 (Tex. App.—Houston [14th Dist.] 1991, writ denied).[10] With this in mind, we begin our review.

Discovery sanctions serve three purposes: (1) to secure the parties' compliance with the discovery rules; (2) to deter other litigants from violating the discovery rules; and (3) to punish parties who violate the discovery rules. *Response Time, Inc.*, 95 S.W.3d at 659–60 (citing *McRae v. Guinn Flying Serv.*, 778 S.W.2d 189, 191 (Tex. App.—Houston [1st Dist.] 1989, no writ)). Although the choice of sanctions is left to the sound discretion of the trial court, the sanctions imposed must be just. *Id.* at 660. Whether a sanction is just is measured by two standards. *TransAmerican*, 811 S.W.2d at 917. First, the sanctions must bear a direct relationship to the offensive conduct. *Id.* A just sanction must be directed against the abuse and toward remedying the prejudice caused to the innocent party, and the sanction should be visited upon the offender. *Spohn Hosp. v. Mayer*, 104 S.W.3d 878, 882 (Tex. 2003). The trial court must attempt to determine whether the offensive conduct is attributable to counsel only, to the party only, or to both. *Id.; see also Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006). Second, the sanction must not be excessive. *TransAmerican*, 811 S.W.2d at 917.

In addition, because a trial court's power to impose "death penalty" sanctions is limited by due process concerns, the court must first consider less severe sanctions before imposing "death penalty" sanctions. *Response Time, Inc.*, 95 S.W.3d at 660. The offensive conduct must justify a presumption that the offending party's claims or defenses lack merit before the trial court may impose "death penalty" sanctions. *Id.* (citing *TransAmerican*, 811 S.W.2d at 917–18).

---

[10] *See, e.g., Aguero v. Aguero*, 225 S.W.3d 236, 238 (Tex. App.—El Paso 2006, no pet.) (no basis to review trial court's decision in absence of record); *Sam Houston Hotel, L.P. v. Mockingbird Rest., Inc.,* 191 S.W.3d 720, 721 (Tex. App.—Houston [14th Dist.] 2006, no pet.)(same); *see also Crown Asset Mgmt., L.L.C. v. Castro*, No. 05-07-01305-CV, 2008 WL 3272169 at *2 (Tex. App.—Dallas Aug. 11, 2008, no pet.) (mem. op.) (although appellate rules require clerk to include certain documents in clerk's record, burden is on appellant to supply court of appeals with complete record demonstrating trial court abused its discretion).

## 1. Lesser sanctions

Appellants rely on statements made by the trial court at the April 30 hearing in support of their argument that the trial court failed to consider lesser sanctions. Specifically, the trial court observed that Boardwalk was seeking death penalty sanctions, and the court must first consider "some other less terminable means." The court stated, "[h]ere the Court has not done anything that I'm aware of to show some less intrusive means short of death penalty sanctions." Appellants argue that when the trial court issued the first death penalty sanction striking their defenses to Boardwalk's commercial bribery claim, there was no prior violation of a court order, no monetary or other sanction assessed, and no ruling on appellants' pending objections to the discovery requests at issue. Further, no discovery was conducted in between the first death penalty sanction and the second, so no new violation had occurred. And monetary sanctions were not imposed until long after trial, rather than assessed first as a lesser sanction to achieve compliance with the rules.

Boardwalk argues that the trial court's statements were made in the context of requesting Boardwalk to address what lesser measures had already been taken. Boardwalk responded that at "the January 13th hearing, the Court granted the motion to compel" regarding certain bank records, and later entered a written order on the subject. The court also ordered that depositions be taken or retaken to address the issues raised by the bank records.

The Sanctions Order lists the trial court's "numerous attempts to compel compliance with discovery requests by Defendants, including trying lesser sanctions." First, the trial court "[h]eld hearings and issued discovery orders" on six different dates, and "among other things, ordered the production of documents responsive to previously propounded discovery." Second, the trial court "granted continuances of trial settings." Third, the trial court "[o]rdered that additional discovery be allowed in an attempt to remedy the prejudice to Plaintiffs." Fourth, the court

–17–

warned appellants that if they were found in contempt, "one remedy for contempt could be an order of confinement." Last, the trial court imposed monetary sanctions, in an amount to be determined at a separate hearing after trial.

Appellants contend that these lesser sanctions are not listed in rule 215.2 and are therefore not appropriate lesser sanctions. Appellants cite no authority for this proposition. The rule itself provides that the trial court "may, after notice and hearing, make such orders in regard to the failure as are just, and *among others* the following . . . ." TEX. R. CIV. P. 215.2(b) (emphasis added); *see also Am. Flood Research, Inc.*, 192 S.W.3d at 583 (where order imposing sanctions did not refer to specific rule or track language of particular rule, appellate court not confined to determining whether sanctions appropriate under that rule alone). We also note that the trial court did not turn to the more severe sanctions specifically listed in rule 215.2, such as "an order refusing to allow the disobedient party to support or oppose designated claims or defenses," and "an order striking out pleadings or other parts thereof," until its other attempts to obtain appellants' compliance with the discovery process had failed.

Appellants argue that an order compelling discovery is not considered an attempt at a lesser sanction, citing *Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 161 S.W.3d 531, 539 (Tex. App.—San Antonio 2004, pet. denied)(*Paradigm I*). Here, however, as in *Paradigm I*, there was more than an order to compel. In *Paradigm I*, the court held death penalty sanctions to be appropriate where the trial court had also stated that noncompliance would result in dismissal, and "the repeated conduct of Paradigm demonstrate[d] bad faith in the litigation process as a whole." *Id.*

And we have recently explained that "the court need not test the effectiveness of each available lesser sanction by actually imposing the lesser sanction on the party before issuing the death penalty." *Shops at Legacy (Inland) Ltd. Pp. v. Fine Autographs & Memorabilia Retail*

*Stores, Inc.*, 418 S.W.3d 229, 233 (Tex. App.—Dallas 2013, no pet.) (citing *Cire v. Cummings*, 134 S.W.3d 835, 840 (Tex. 2004)). Rather, the trial court "must analyze the available sanctions and offer a reasoned explanation as to the appropriateness of the sanction imposed." *Id.* (citing *Cire*, 134 S.W.3d at 840).

Here, the trial court's Sanctions Order reflects that the trial court "considered and tried these less intrusive sanctions," but "once the scope of Defendants' discovery abuses came to light shortly before trial, the Court found that no lesser sanction than the striking of Defendants' affirmative defenses would suffice to adequately address the magnitude of Defendants conduct." Despite the lesser sanctions imposed, appellants "still refused to comply with the Rules of Civil Procedure to produce all relevant documents before trial which resulted in significant prejudice" to Boardwalk's ability to prepare for trial and to present its case "as well as significant costs."

The Sanctions Order expressly states the court "considered, and rejected" granting an additional continuance and re-opening discovery. The court rejected these options because they had proven ineffective when previously ordered; they would benefit appellants and increase the costs to Boardwalk; and they would "not adequately serve to correct the Defendants' discovery abuses." The court found that "[e]ven after striking the Defendants' affirmative defenses the Defendants did not comply with the Court's Orders, concealing relevant documents responsive to Plaintiffs' discovery requests relevant to specific contested issues at trial."

Appellants also contend that without the imposition of lesser sanctions, the trial court could not presume that its defenses lacked merit, citing *TransAmerican*. *See TransAmerican*, 811 S.W.2d at 918 ("Discovery sanctions cannot be used to adjudicate the merits of a party's claims or defenses unless a party's hindrance of the discovery process justifies a presumption that its claims or defenses lack merit."). Appellants argue that "Boardwalk's case was so weak as to most of its causes of action that the jury found zero damages on most of Boardwalk's

claims." They also assert that on the TTLA claim for which the jury found damages, the trial court excluded appellants' evidence that they had paid for the eleven cars in question. Thus, they argue that "there was nothing in the record which would demonstrate or raise a presumption" that their defenses lacked merit. (Boardwalk argues the excluded evidence establishes only that appellants paid an entity called "Magic Imports" for the cars, not that Boardwalk was ever paid for the cars.)

The trial court, however, concluded that it was impossible to tell whether either Boardwalk's claims or appellants' defenses had merit because all responsive documents had not been produced, reviewed, and analyzed in time to present a complete case to the jury. The court found that even after orders to compel, appellants "had still failed to produce all relevant and material documents," and "[t]his information would have been relevant to Plaintiffs' damages claim for gross revenue and net profit obtained by Defendants on each and every vehicle acquired from Plaintiffs." The trial court further concluded that "[t]his information was essential to Plaintiffs' demonstration of damages for disgorgement and equitable forfeiture."

Citing *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 849–50 (Tex. 1992), appellants argue that reimbursement of expenses would be a better remedy for any prejudice suffered by appellees than death penalty sanctions. *See id.* (reimbursement of attorney's fees and expenses for pursuing motions to compel and sanctions "would appear to be better calculated to remedy" prejudice from failing to produce documents than death penalty sanctions). In *Blackmon*, however, there was no showing that the plaintiffs were unable to prepare for trial without the additional crash tests they sought from Chrysler, or that the missing tests were in Chrysler's possession, custody, or control, or that the tests even existed. *Id.* at 850. In addition, no lesser sanctions had been imposed. *Id.* Here, there is no dispute that responsive documents existed, were within appellants' possession, custody, or control, and were not produced. Further, the trial

court expressly found that the information appellants failed to timely produce was "essential" to Boardwalk's demonstration of damages. The trial court admonished appellants repeatedly that relevant documents must be produced, regardless of appellants' belief that the documents showed only legal and appropriate activity.

We conclude the trial court made repeated efforts to obtain appellants' compliance with their discovery obligations. Despite orders to compel, warnings of contempt, continuance of the trial setting, reopening of discovery, and hours of court hearings at which the court repeatedly emphasized the importance of obtaining the facts upon which the jury could make its determination, appellants failed to disclose the existence of documents responsive to Boardwalk's requests until trial preparation had almost concluded, or, in the case of the CGI documents, until trial had commenced. We overrule appellants' first issue.

## 2. Evidence of causation

In their second issue, appellants complain that the trial court did not allow them to offer evidence of causation, citing our opinion in *Kirkpatrick v. Memorial Hospital of Garland*, 862 S.W.2d 762 (Tex. App.—Dallas 1993, writ denied). In *Kirkpatrick*, we stated that even though the hospital's pleadings had been stricken as a discovery sanction, the hospital "had the right to put on its own expert witnesses to defeat the Kirkpatricks' claim that the event sued upon caused their damages." *Id.* at 773. Specifically, the hospital could offer evidence that the cause of the plaintiff's cerebral palsy was a pre-existing congenital malformation, not the result of the hospital's negligent medical services. *Id.*

*Kirkpatrick* is distinguishable. Here, there is no separate question of causation to be resolved by a jury. The trial court ruled, as a discovery sanction, that appellants were liable for the theft of eleven cars and were prohibited from offering evidence of payment for the cars. Appellants' proof that the theft was not the cause of any damages to Boardwalk is the same proof

–21–

that no theft occurred; that is, there would be no theft if appellants had paid for the cars. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 134.002(2) (defining "theft" for purposes of TTLA as "unlawfully appropriating property" under Texas Penal Code). Allowing appellants to offer this proof would negate the trial court's ruling on appellants' liability. There is no other potential cause of damages for theft than the appellants' failure to pay for the cars. In contrast, in *Kirkpatrick*, there was another possible cause of the plaintiff's injury, and thus a fact question for a jury to resolve. *See id.*

We find support for our conclusion in the Texas Supreme Court's decision in *Paradigm Oil, Inc. v. Retamco Operating, Inc.*, 372 S.W.3d 177, 183–87 (Tex. 2012) (*Paradigm II*). In *Paradigm II*, the trial court had not only stricken Paradigm's pleadings for discovery abuse, but also had denied Paradigm the right to participate in the trial to determine unliquidated damages and attorney's fees. *Id.* at 184. The *Paradigm II* court cited *Kirkpatrick* for the "general rule" that "a defendant who has not answered but nevertheless appears at the post-default hearing on damages is entitled to participate." *Id.* at 183 n.7. The court concluded that Paradigm should have been allowed to participate in the damages portion of the trial. *Id.* at 187.

The *Paradigm II* court discussed the different types of default judgments, emphasizing that where pleadings are stricken as a discovery sanction, the principles governing discovery sanctions must be considered in addition to the principles that apply to default judgments generally. *Id.* at 184. Citing *TransAmerican*, the court stated that a default judgment on liability "cannot be used to adjudicate the merits of claims or defenses unless the offending party's conduct during discovery justifies a presumption that its claims or defenses lack merit." *Id.* The court explained that "[t]he justification for also barring the defaulted party from the ensuing evidentiary trial on damages must go beyond that presumption because the damages issue is materially different." *Id.* at 186. The court explained the differences:

–22–

> The existence, or not, of facts establishing liability lends itself to the first presumption. For instance: Did the defendant's negligence proximately cause the occurrence? Was the defendant indebted to the plaintiff? Striking the defendant's answer establishes the answer to these questions. The either/or character of liability facts, however, does not translate to a claim for unliquidated damages, which cannot be determined by answering "yes" or "no." By their very nature, unliquidated damages are not susceptible to exact calculation and involve a range of possible answers. For this reason, a defaulting defendant admits facts establishing liability but not any claimed amount of unliquidated damages.

*Id.* (citations omitted).

The court concluded that barring Paradigm's participation in the post-default damages phase of the case was an excessive sanction because it did not serve any purpose other than punishment. *Id.* at 187. Compensatory damages awarded post-default "should compensate the injured party for its loss, not penalize the wrongdoer or allow the plaintiff a windfall." *Id.* The court explained that discovery sanctions are intended to remedy discovery abuse and should be tailored to serve their remedial purpose. *Id.* Where the death penalty sanctions that ended the liability litigation had already achieved this purpose, the additional sanction of precluding Paradigm from the damages trial was excessive. *Id.*

Using the *Paradigm II* court's analysis, the "yes" or "no" question answered by striking appellants' answer was whether appellants were liable for theft of the eleven cars. Unlike the circumstances in either *Kirkpatrick* or *Paradigm II*, striking appellants' answer also answered the question of causation of damages. Appellants could have offered proof that the eleven cars were worth less than the amount claimed by Boardwalk, but they were precluded from offering proof that they were not liable for theft at all (or that they were only liable for theft of some fewer number of cars). The specific discovery abuse of failing to produce documents showing

payment for the cars was remedied by excluding those documents from the evidence.[11] Allowing appellants to offer that same proof to negate causation of damages would effectively lift the sanction. The sanction directly addressed the specific discovery abuse and was "no more severe than necessary to satisfy its legitimate purpose." *Paradigm*, 372 S.W.3d at 187 (quoting *TransAmerican*, 811 S.W.2d at 917). We overrule appellants' second issue.

### 3. Responsibility of counsel

The trial court made several rulings regarding appellants' prior counsel. As noted above, the court's order of April 14, 2010, recites that a hearing was held on March 22, 2010, to consider prior counsel's conduct. In the same order, the trial court found that the conduct of Perry-Miller and Dyer "was in compliance with the ethical rules and obligations of attorneys to the Court," and their conduct did "not warrant . . . the imposition of any sanctions against them."

At the pretrial conference on April 30, 2010, however, the trial court "vacate[d] its previous rulings" regarding Looper Reed and stated that both counsel and clients would be sanctioned jointly and severally "as both I believe did not follow their respective requirements under the rules of discovery." But at the second post-trial hearing on November 16, 2010, the trial court vacated its verbal order from April 30 after concluding it had not given Looper Reed "adequate notice at the time of that hearing what I was about to do to them," and stated that further hearing on the issue was required. The trial court emphasized that "the sanctions are going to be the same," but "[t]he question is, who is going to be responsible to pay them;" the clients, the attorneys, or both.[12]

---

[11] *See also* TEX. R. CIV. P. 215.2(3) (allowing trial court, as a sanction, to order that particular facts "shall be taken to be established" in accordance with the claim of the party injured by the discovery abuse).

[12] Counsel for Looper Reed also pointed out that at the time of the April 30 hearing, there was no pending motion for sanctions against Looper Reed. Boardwalk's original motion for sanctions filed on March 30, 2010, requested sanctions against the attorneys, but Boardwalk's amended motion filed on April 12 and subsequently heard did not.

These issues were resolved by the trial court at a hearing on March 4, 2011.[13] The trial court heard testimony and argument on the amount of sanctions to be awarded and whether the clients, the attorneys, or both should pay. The trial court explained that the sanctions already imposed were to address "the conduct and the impressions that were made when responses to discovery were delivered that were incorrect and untrue and, at worst, a lie." Dyer was called to testify. He stated his clients misled him about the existence or non-existence of responsive documents. He testified he "was specifically told on numerous occasions that there were no payments to Boardwalk employees that would look suspicious or cause any reason for concerns." He also testified appellants withheld from him responsive information that was discoverable, and represented to him that they had produced the entire universe of documents.

The trial court asked if either Dyer or Perry-Miller had represented to the court that they had reviewed bank records sought by Boardwalk and had not found anything responsive. Dyer did not recall "ever telling the Court that I had reviewed the bank records," but the trial court stated that its recollection was different and that a protective order was granted on that basis.

Dyer conceded he did not ask appellants for all records and documents of payments made by appellants to employees of Boardwalk, and he did not send the request for production to any of the appellants including Critcher. But he disagreed the cause of the problems with document production was "bad miscommunication" from his office. Although he had testified at a prior hearing that he had not sent the requests for production to appellants, he clarified that "I was referring to the fact that I personally could not vouch for having sent them; but going back and looking at the documents and looking at what I did in the case, I do recall . . . conversations I

---

[13] At the outset of this hearing, Looper Reed contended that Boardwalk had failed to request a pretrial hearing or obtain a ruling on their alleged discovery abuse, and had therefore waived any claim based on that conduct, citing *Remington Arms Co. v. Caldwell*, 850 S.W.2d 167, 170 (Tex. 1993). Although the trial court overruled this argument at the March 4 hearing, it subsequently denied Boardwalk's motion for sanctions on this ground, stating its reasoning in a May 3, 2011 memorandum to counsel. There is no discussion of this ruling in the parties' appellate briefing.

–25–

had, which would have to indicate the clients received those documents." He specified he had conversations with Monarch about payment documentation for the cars and Stacy about bank records. He also testified Stacy and Critcher had instructed him to deal with Monarch for obtaining documents to respond to requests for production. Dyer testified he told his clients to produce bank records related to vehicles purchased from Boardwalk after the court ordered them to do so. He produced some records, but learned (after he was no longer representing appellants) that there were additional responsive records.

The trial court asked Dyer whether appellants had told him only that they had no documents reflecting "suspicious" payments to Boardwalk employees, or whether appellants had told him they had no documents at all reflecting any payments to Boardwalk employees. Dyer testified his clients told him two specific things about responsive documents:

> THE WITNESS: Well, . . . two things. Everything is in the deal jackets, so I am already relying on the fact that the client is telling me you don't need to go look anywhere else, I have given you everything I have. But then I over and over heard there are no payments; there is nothing, no payments. And I – why would I go back and ask my client again would he have any payments to Boardwalk employees? I have heard him say it over and over already.
>
> THE COURT: And we know that was not true.
>
> THE WITNESS: That was not true.

James Ribman, also of Looper Reed, testified he met with Stacy and Critcher twice to prepare the responses to Boardwalk's first request for production, and drafted the responses himself. He stated he brought a copy of the requests for each of them, and discussed whether they had documents responsive to it. In the meetings with Stacy and Critcher, he made it "as clear as he could" that he needed to know if they or any of their businesses had made payments to Boardwalk employees. He was told that other than "payments to Boardwalk itself for the purchase of cars," there were no payments made. He also testified that during his involvement

–26–

early on in the case, he made clear to Stacy the importance of producing all documents showing any payments to Boardwalk or its employees, because it was possible that allegations of criminal conduct could be made. Ribman conceded that he had no written record of warning the clients of the importance of producing documents, or of the content of his specific conversations with Stacy and Critcher about the requests for production. He also conceded he had no knowledge of what the clients were told about any specific order compelling the production of documents.

In a memorandum dated May 3, 2011, the trial court denied Boardwalk's motion for sanctions against Looper Reed. The trial court also ruled, however, that it was "still unable to segregate the conduct of the Defendants from the conduct of their previous counsel" and therefore "applied an appropriate reduction in the amount of sanctions awarded against the Defendants as a result of their specific conduct."

Appellants correctly argue, and the trial court recognized, that compliance with *TransAmerican* requires the trial court to consider whether the offensive conduct is attributable to counsel only, to the party only, or to both. *See TransAmerican*, 811 S.W.2d at 917. Appellants contend "the bulk of the blame" lay with their prior counsel, who failed to adequately inform and advise them of their discovery obligations. They cite Stacy's testimony that he did not see appellants' responses to the second request for production before they were served on Boardwalk; Dyer never called him regarding the second request for production; he was not aware of any problems with the production until after a pretrial hearing was held; none of his attorneys asked him about payments to Boardwalk employees; and he completely relied on his attorneys to make judgments regarding what documents to produce. Stacy also testified he gave Looper Reed full access to his bookkeeper and his available records to prepare responses to discovery. Stacy signed releases for production of bank records, and testified about documents he produced.

–27–

The record reflects the trial court considered and reconsidered these issues at multiple hearings. The trial court itself initially called Dyer as a witness. The trial court also heard extensive testimony from Monarch regarding the instructions she had received from counsel and the efforts she had made to find and produce responsive documents. The testimony of these witnesses directly conflicted on significant points. The trial court was the judge of the credibility of these witnesses. *See, e.g., Tate v. Commodore Cnty. Mut. Ins. Co.*, 767 S.W.2d 219, 224 (Tex. App.—Dallas 1989, writ denied) (hearing on motion for sanctions akin to nonjury trial, where trial court is judge of credibility of witnesses and weight to be given testimony). After reviewing the entire record, we conclude the trial court did not abuse its discretion in assessing sanctions only against appellants. We overrule appellants' third issue.

### 4. Possession, custody, or control of documents

Relying on *In re Kuntz*, 124 S.W.3d 179, 184 (Tex. 2003), Critcher argues he had no obligation to produce the checks, QuickBooks files, or CGI documents at issue because these items were not within his possession, custody, or control as required by rule 192.3(b).[14] *Kuntz* was a dispute between ex-spouses regarding the ex-wife's share of certain oil and gas royalty interests. *See id.* at 181–82. The ex-wife sought to discover documents relating to the royalty interests. *Id.* at 182. In response, the ex-husband Kuntz asserted he did not have possession, custody, or control of the documents. *Id.* at 182–83. The court explained "[i]t was undisputed that Kuntz's employer had actual physical possession of the relevant documents, that the documents were owned by a client of Kuntz's employer, and that the client claimed the documents contained its privileged trade secrets." *Kuntz*, 124 S.W.3d at 180. Kuntz was a "minority owner and the general manager" of his employer, as well as a member of the

---

[14] Rule 192.3(b) provides in relevant part, "A person is required to produce a document or tangible thing that is within the person's possession, custody, or control." TEX. R. CIV. P. 192.3(b).

company's board. *Id.* at 182. He was also in charge of the company's day-to-day operations. *Id.* Although Kuntz had access to the documents, he would have violated a confidentiality agreement with his employer as well as the consulting agreement between his employer and its client by producing the documents. *See id.* at 184. The *Kuntz* court held that a person's mere access to a document does not constitute "possession, custody, or control" within the meaning of the rule. *Kuntz*, 124 S.W.3d at 184; *see also In re Shell E&P, Inc.*, 179 S.W.3d 125, 131 (Tex. App.—San Antonio 2005, orig. proceeding) (following *Kuntz*).

Critcher argues the CGI data was in the possession of a non-party to the case, a software company called eCarList.com (eCarList). Critcher contends the data "arguably belonged to one of the Imagine Automotive Group defendants, a party defendant in which Critcher owned no interest and over which he had no authority." Critcher argues neither of the individual defendants had the responsibility or obligation to produce corporate records of either the Imagine defendants or the non-party eCarList.

We disagree with Critcher's arguments. Rule 192.7 provides that possession, custody, or control of an item "means that the person either has physical possession of the item or has a right to possession of the item that is equal or superior to the person who has physical possession of the item." In interpreting this language, the *Kuntz* court relied on *GTE Communications Systems Corp. v. Tanner*, 856 S.W.2d 725, 729 (Tex. 1993), in which the court discussed a previous version of the rule. The court in *GTE* explained that "possession, custody, or control" included "not only actual physical possession, but constructive possession, and the right to obtain possession from a third party, such as an agent or representative." *Id.* The court also stated, "[t]he right to obtain possession is a legal right based upon the relationship between the party from whom a document is sought and the person who has actual possession of it." *Id.* (also quoted in *Kuntz*, 124 S.W.3d at 181).

Here, in contrast to *Kuntz*, no evidence shows that Critcher would have been violating any confidentiality agreements or other contracts with either the corporate defendants or any non-party. There is evidence, however, regarding Critcher's relationship with eCarList. On the third day of trial, the trial court called Critcher as a witness regarding the CGI documents. The trial court inquired whether Critcher recognized the heading on one of the documents "that says something like eCarList.com slash something." Critcher replied:

> MR. CRITCHER: Yes, it is a document produced by a software company that I am the CEO of.
>
> THE COURT: And what is that software company?
>
> MR. CRITCHER: eCarList.
>
> THE COURT: And what is eCarList?
>
> MR. CRITCHER: We provide marketing, like inventory marketing where dealers – they basically – we are not a DMS system, which is the dealer management system, no accounting software; we just simply put the cars into the system and it allows those cars to be distributed to eBay, Auto Trader and Cars.com . . .
>
> THE COURT: Was Imagine Auto Group a subscriber to that software?
>
> MR. CRITCHER: Correct.

The court went on to inquire what kind of data was kept on the eCarList software and what years the data would cover. Critcher testified he did not believe Imagine Auto Group had access to transactions that took place between 2003 and 2007. But Critcher admitted information could be obtained about a specific car using the vehicle identification number (VIN). On cross-examination, Boardwalk's counsel confirmed that Critcher was the chief executive officer of eCarList, and inquired:

> Q. So you have had access to this data since this lawsuit began, if you had wanted to get it? True?
>
> A. Yes, sir.

Critcher testified on further examination that he had not seen a request for production of documents in the case "until the sanctions hearing." He stated:

Q. Okay. So if someone had asked you or told you that you were being asked to go get these, you could have gone and got those; some way, somehow?

A. Yes, sir.

Q. No one asked you that?

A. No, sir.

The record reflects that requests for production were made to Critcher as an individual defendant, and he had more than "mere access" to documents containing relevant information. *See Kuntz*, 124 S.W.3d at 184; *see also Kia Motors Corp. v. Ruiz*, 348 S.W.3d 465, 485–87 (Tex. App.—Dallas 2011) (*rev'd on other grounds*, No. 11-0709, 2014 WL 1258169 (Tex. Mar. 28, 2014)) (rejecting argument that Kia did not have possession, custody, or control of quality control documents held by its supplier). There is similar evidence that Stacy, as principal of the appellant entities, had possession, custody, or control of corporate documents, and no contractual obligations that would hinder his ability to produce them, in contrast to *Kuntz*. *See Kuntz*, 124 S.W.3d at 184. We overrule the portion of Critcher's first issue contending that he did not have possession, custody, or control of relevant documents.

**5. Appropriateness of sanction and relationship to sanctionable conduct**

All of the appellants make additional arguments in their issues challenging the propriety of the trial court's sanctions. First, Critcher contends no evidence shows he committed any sanctionable conduct. Boardwalk responds that because Critcher was aware of violations of the discovery rules and did nothing to correct them, he must bear some responsibility for appellants' discovery abuses. Boardwalk points to Critcher's presence at the February 5, 2010 hearing when the court found appellants did not accurately or properly respond to discovery requests.

Boardwalk argues Critcher was deposed after that date, but did nothing to correct the inaccurate discovery response. As noted above, Critcher also testified he was aware of and had access to CGI data from the outset but did not produce it. Conflicting evidence exists as to whether Critcher saw or was consulted about Boardwalk's discovery requests, including the testimony from Dyer and Ribman discussed above. Critcher does not deny he was present at discovery hearings and does not argue he was unaware of the deficiencies in his discovery responses after attending those hearings. *See Paradigm I*, 161 S.W.3d at 537 (sanctions against party appropriate where there was "no suggestion" that party was "not fully aware" of non-compliance with discovery or sanctionable conduct of its counsel).

Next, appellants contend the information contained in the CGI documents was duplicative of the information timely produced in the 900 deal jackets so that there was no prejudice to Boardwalk in appellants' failure to produce them. The trial court responded to this argument on the third day of trial before striking the pleadings, replying, "we are just speculating . . . because we don't know what the full, complete set of those documents would, in fact, tell us, if anything. We don't know one way or the other." The court stated even if it ordered "950 printouts" be done overnight, "we are in the middle of trial" without time to analyze and compare the information the printouts might reveal. The court continued,

> And that's the problem with the discovery abuse that has occurred thus far is just – the credibility of the discovery that has been produced is in question.
>
> And I don't think that if this is a one-time deal we are anywhere close to considering the sanctions that we have now. But this instance cannot be taken in a vacuum as compared to every other pulling teeth of discovery that this court has tried to do to get out of the Defendant.

Next, appellants argue the sanctions were too severe. They distinguish cases upholding death penalty sanctions in which the sanctioned party produced no documents at all, destroyed

–32–

relevant evidence, or disregarded court orders. *See, e.g., Cire*, 134 S.W.3d at 841–42 (plaintiff deliberately destroyed audiotapes "after being thrice ordered to produce them"); *Andras v. Mem'l Hosp.Sys.*, 888 S.W.2d 567, 570–72 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (database destroyed despite pending request to produce it). Appellants also argue where such deliberate conduct was absent, death penalty sanctions were held inappropriate. *See In re Western Star Trucks US, Inc.*, 112 S.W.3d 756, 766 (Tex. App.—Eastland 2003, orig. proceeding) (trial court's death penalty sanction not appropriate where relator made efforts "to at least partially comply with the trial court's order compelling discovery"). They contrast their production of more than 900 deal jackets, 600 checks, and their entire QuickBooks database, as well as appearance for depositions and compliance with specific orders to compel.

We agree no evidence shows that appellants intentionally destroyed relevant evidence, in contrast to *Cire* and *Andras*. But the record as a whole supports the trial court's conclusion that appellants knew additional documents responsive to Boardwalk's discovery requests existed, but represented to the court they did not exist, and failed to produce them, resulting in Boardwalk's inability to prepare its case. For example, the record reflects that when appellants did not produce any checks showing payments to Boardwalk employees, Boardwalk served subpoenas on appellants' banks, seeking to obtain the checks from another source. The record shows Stacy was aware of Boardwalk's attempts to obtain bank records and expressed concern to his counsel, who objected to the subpoenas. The trial court quashed the subpoenas on the representation that there were no responsive documents in the bank records. When Boardwalk obtained the bank records from another source over a year later, it became apparent that this representation was false. Appellants took the position that the payments shown by the checks were legal, and therefore the checks were not relevant or responsive to Boardwalk's discovery requests, an argument the trial court found to be frivolous.

The trial court made specific findings that appellants abused the discovery process, and listed the consequences of the abuse. The sanctions imposed by the trial court bore a direct relationship to the abuse and were not excessive. *See TransAmerican*, 811 S.W.2d at 917. The trial court first struck appellants' defenses to Boardwalk's commercial bribery claim after hearing evidence that appellants had in their possession and failed to produce evidence showing payments made to Boardwalk employees. The court had already quashed subpoenas on the representation by counsel that there would be no record of any relevant payments in appellants' bank records, then later ordered production of those bank records and allowed additional depositions to be taken on the subject when it became clear that responsive documents did exist. The trial court then learned that the entire exercise of obtaining documents from third parties could have been avoided altogether had appellants revealed in their first responses to discovery in 2008 that responsive information existed on their QuickBooks database.[15] Striking appellants' defenses to the commercial bribery claim was directly related to this conduct.

Similarly, striking appellants' answers bore a direct relationship to the abuse found by the trial court. Before imposing this sanction, the trial court again heard testimony and argument regarding appellants' failure to identify or produce additional responsive documents. The court cited its previous attempts to obtain compliance with discovery, and again gave a lengthy explanation of its concerns with the appellants' conduct in the discovery process. The court explained that the parties and the court should have been able to rely on appellants' representations that all relevant documents had been produced, but instead, the burden was placed on Boardwalk to continue to search for and identify categories of responsive documents

---

[15] Appellants point out that "[i]t also does not appear from Boardwalk's discovery requests that a proper request was ever made for electronic discovery under Rule 196.4," citing *In re Weekley Homes*, 295 S.W.3d 309, 314–16 (Tex. 2009), and *MRT, Inc. v. Vounckx*, 299 S.W.3d 500 (Tex. App.—Dallas 2009, no pet.). We agree that Boardwalk's requests for production in the record do not comply with rule 196.4. *See* TEX. R. CIV. P. 196.4 (requesting party must "specifically request production of electronic or magnetic data and specify the form in which the requesting party wants it produced"). It is also apparent from the record, however, that the trial court heard extensive testimony and argument on the issue of electronic discovery at the post-trial hearings. Appellants do not discuss how the cases cited apply or how the trial court erred in any ruling relating to electronic discovery. Without assignment of error and briefing, we are unable to consider the argument further. TEX. R. APP. P. 38.1(i).

that had not been produced. As a result, large volumes of documents had been produced at the last minute, precluding Boardwalk from full preparation of its case, and resulting in trial by ambush. The court cited its frustration that it had been unable to "get all of the facts out on the table, just try it," because of the discovery abuse. The court explained that while it may not be fair to appellants to impose sanctions in the middle of trial, "it is equally not fair to have another party go to trial without all of the information they need to . . . prove their case . . . ." The court therefore struck appellants' pleadings "in total."

We also conclude the sanctions were not excessive. We first note that the commercial bribery claim was not submitted to the jury, so there was no prejudice to appellants from striking their defenses to it. Our review of the record also reveals that over the course of the pretrial proceedings, the trial court's primary goal was to ensure that each party obtained the information it needed to prepare for trial. Both parties filed numerous motions to compel in the years prior to trial. From the first discovery hearings referenced in the record, the trial court made clear that documents reflecting payments to Boardwalk employees or payments for vehicle purchases were responsive to Boardwalk's requests and must be produced. The trial court appointed an auditor to facilitate the process of determining whether payment had been made for the cars at issue. The trial court also heard numerous discovery disputes and considered requests to obtain relevant information from third parties such as banks. Although appellants always produced some documents in response to each of the trial court's orders, the trial court concluded that appellants were not forthcoming in identifying and producing categories of responsive documents.

The trial court reached the conclusion that had appellants timely produced all of the responsive documents in their possession, Boardwalk could have been spared a great deal of delay and expense in attempting to prepare its case. "Discovery proceedings have as their aim and purpose the administration of justice by allowing the parties to obtain the fullest knowledge

–35–

of issues and facts prior to trial." *West v. Solito*, 563 S.W.2d 240, 243 (Tex. 1978); *see also In re Kimberly-Clark Corp.*, 228 S.W.3d 480, 490 (Tex. App.—Dallas 2007, orig. proceeding) (citing *West*). "The ultimate purpose of discovery is to seek the truth so that disputes may be decided by what the facts reveal, not by what is concealed." *Id.* The trial court made clear to the parties that documents revealing facts about payments to Boardwalk employees must be produced, regardless of whether the parties agreed on the characterization of payments as illegal bribes or appropriate referral fees. The trial court also made clear that documents revealing facts about payments for cars must be produced, regardless of how the parties interpreted the timing and amount of payments for the cars. The court and the jury would decide the meaning and consequences of the facts, but the facts themselves must be disclosed. As the trial court stated at the April 21 hearing,

> I almost got caught up in the thing because for many a hearing, many a hearing, on representations made by Defendants to their counsel, I had limited or completely stopped the Plaintiffs' ability to go into certain matters, specifically bank accounts, because I thought they were paranoid or on a fishing expedition. But for the unnecessary – should have been unnecessary efforts by the Plaintiff to find out the information outside of this court, who would have never known what we know today or had the information we know today? You can't change the facts. They are what they are. And the jury is going to decide what they decide based upon the facts. But what you can't do and the rules don't let you do is hide the ball. Because hiding the ball does not advance the ball to get to the ultimate decision in this case, which needs to be made based upon all of the facts that are before us. So they should have been produced.

After reviewing the entire record, we conclude the trial court did not abuse its discretion in imposing sanctions against appellants. *See TransAmerican*, 811 S.W.2d at 917. We overrule appellants' first three issues and Critcher's first four issues challenging the imposition of sanctions against them.

A trial court has considerable discretion in framing a jury charge.  *Redwine v. AAA Life Ins. Co.*, 852 S.W.2d 10, 14 (Tex. App.—Dallas 1993, no writ).  In determining whether there has been an abuse of discretion, this Court may not substitute its judgment for that of the trial court but must determine only whether the trial court's action was arbitrary or unreasonable.  *Id.*

## 1.  Comment on the weight of the evidence

In their fifth issue, appellants complain that the trial court's instructions to the jury constituted an impermissible comment on the weight of the evidence.  Critcher makes the same complaints in his fifth and sixth issues.   Specifically, appellants complain the trial court instructed the jury that "the Defendants are liable to the Plaintiffs for participating in the breaches of fiduciary duty by Plaintiff's employees," and "the Defendants are liable to the Plaintiffs for violation of the Texas Theft Liability Act."   An impermissible comment on the weight of the evidence occurs when "after examining the entire charge, it is determined that the judge assumed the truth of a material controverted fact, or exaggerates, minimizes, or withdraws some pertinent evidence from the jury's consideration."  *Am. Bankers Ins. Co. of Florida v. Caruth*, 786 S.W.2d 427, 434 (Tex. App.—Dallas 1990, no writ).  The comment must also be one that probably caused the rendition of an improper judgment.  *Id.*  Incidental comments are permissible when necessary as part of an explanatory instruction or definition.  *Id.*

If an instruction might aid the jury in answering the issues presented to them, or if there is any support in the evidence for an instruction, the instruction is proper.  *Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012) (citing *La.-Pac. Corp. v. Knighten*, 976 S.W.2d 674, 676 (Tex. 1998)).  Here, the jury had heard opening statements and several days of testimony relating to appellants' liability on the causes of action asserted by Boardwalk.  The trial court then struck appellants' pleadings, so that liability was no longer an issue to be determined by the jury.  It was necessary for the trial court to give some instruction to the jury about the matters that would be

presented for their determination.[16] The judge's instructions were short, defining the three causes of action for which the jury was to determine damages and informing the jury "that the Defendants are liable to the Plaintiffs" on those causes of action.

In contrast, in *Caruth*, one of the cases relied on by appellants, the trial court included thirty-six findings of fact in the jury charge after striking the appellant's pleadings as a discovery sanction. *Caruth*, 786 S.W.2d at 435. These findings included statements that the defendant had misled the plaintiff, had made misrepresentations, and had no reasonable basis for its actions. *See id.* at 431–34. We concluded the trial court had gone "beyond simply charging the jury as to uncontroverted facts," and the findings of fact "were not designed to be helpful to the jury in answering any of the questions in the court's charge." *Id.*

In *Redwine*, another case cited by appellants, we concluded the trial court's instructions that the defendant did not breach the duty of good faith and fair dealing, and that the plaintiff's claims were not covered by the defendant's insurance policy, were comments on the weight of the evidence when the jury still had before it an issue regarding the misleading nature of the defendant's advertisement. *See Redwine*, 852 S.W.2d at 17. Here, however, the only questions for the jury were amounts of damages. All of these questions included the limitation "if any," often more than once. And the jury answered that there were zero damages in response to seven of the nine queries presented to them. We conclude the trial court's instructions did not constitute improper comments on the weight of the evidence. We overrule appellants' fifth issue and Critcher's fifth and sixth issues.

---

[16] In overruling appellants' objection on this point, the trial court explained, "the Court feels it is absolutely necessary to put in the definitions of these causes of action" because without definitions, the jury would lack "guiding principles" for the questions on damages, and "the jury would be more confused than not."

## 2. Separate awards of damages

In his seventh and eighth issues, Critcher complains that "by failing to require a separate damage award to each plaintiff," Questions 1 and 3 of the jury charge "commingle[ ] valid and invalid damage awards for which there was no evidence and for which some of the plaintiffs lacked standing, thereby depriving Critcher of a meaningful appellate review of the legal sufficiency of the evidence in support of the jury's award." Question 1 inquired about damages for appellants' "participating in the breaches of fiduciary duty by the Plaintiffs' employees Robert Rodriguez, David Morgan, Karl Lenderman, Craig Campbell, [and] Kim Fuller." Question 3 inquired about damages under the TTLA.

In his ninth and tenth issues, argued together with his seventh and eighth issues, Critcher contends there is insufficient evidence, or no evidence, to support the jury's award of damages for theft because it is equally likely that the damages belong to any of the three plaintiffs or to the five other Boardwalk dealerships who were not parties to the case.

At the charge conference, appellants objected to Question 1 on the ground that it "consolidat[ed] all Defendants with all Plaintiffs," contrary to the holdings of *Crown Life Insurance Co. v. Casteel*, 22 S.W.3d 378 (Tex. 1998), and *Harris County v. Smith*, 96 S.W.3d 302 (Tex. 2002). Appellants' counsel argued that "by submitting and consolidating all of the Defendants together with all of the Plaintiffs, invalid theories will be submitted to the jury in one single question, upon which one of those theories would be invalid because there is no evidence." Appellants also objected to Question 1 because "there is no evidence; or alternatively, insufficient evidence that any of these employees, alleged employees, were actually employed by the correct entities who aren't named and separated in the question." On appeal, Critcher contends that there was no evidence of which employee was employed by which

plaintiff entity, and so no evidence that any of the five individuals owed fiduciary duties to any of the three plaintiffs.

Similarly, appellants objected to Question 3 because "Plaintiffs and Defendants are not defined." Their objection continued, "[a]gain, it would mix, under *Crown Life v. Casteel* [and] *Harris County*, invalid theories with valid theories and prevent the Defendants from challenging, through a granulated instruction broken out by entity and Defendant, on appeal, to attack any no evidence finding."

The only damages witness was Ken Ambrose, the senior vice president of the Boardwalk Auto Group. Critcher argues Ambrose testified only as to the Boardwalk group as a whole, including some entities that were plaintiffs and some that were not. Ambrose's testimony was not limited to the three plaintiffs or to any one plaintiff, and he did not testify about which entity employed the individuals listed in Question 1. Critcher also contends that Question 3, on which the judgment was rendered, "also contains both valid and invalid damages claims," because Ambrose never specified which individual plaintiff suffered damages in any specific amount, but instead testified as to a total amount of damages suffered by the Boardwalk group (including plaintiff and non-plaintiff entities) as a whole. Critcher argues that to have standing under the TTLA, a plaintiff must have sustained damages from the theft, and standing cannot be conferred by default.

In *Casteel*, the court held that reversible error is presumed when a broad-form question submitted to the jury incorporates multiple theories of liability and one or more of those theories is invalid. *See Thota*, 366 S.W.3d at 680 (describing holding of *Casteel*, 22 S.W.3d at 388). In *Harris County*, the court held that reversible error is presumed when a broad-form question commingles damage elements that are unsupported by legally sufficient evidence. *Id.* (describing holding of *Harris Cnty.*, 96 S.W.3d at 233–34). The rationale for presuming harm in

these cases is that "meaningful appellate review is precluded." *Id.* at 688 (quoting *Bed, Bath & Beyond, Inc. v. Urista*, 211 S.W.3d 753, 756–57 (Tex. 2006)). That is, an appellate court is unable to determine whether the jury found the defendant liable on a valid basis or an invalid basis. *See id.*

Neither Critcher nor appellants cite a case applying *Casteel* or *Harris County* where liability has already been established by striking of a defendant's pleadings. As we have discussed above, the *Paradigm II* court stated that striking the defendant's answer establishes the answer to the question, "Was the defendant indebted to the plaintiff?" *Paradigm II*, 372 S.W.3d at 186. There was no opportunity for the jury to find the defendants liable on an invalid basis. *See Thota*, 366 S.W.2d at 688. Boardwalk also points out that each defendant was a co-conspirator and therefore "responsible for all acts done by any of the conspirators in furtherance of the conspiracy."[17] Therefore, as to Question 3, the finding on which the trial court's judgment was rendered, we conclude that appellants' complaints are not well-taken. All of the defendants were liable for the amount of damages found by the jury for the theft of the eleven cars.

As to Question 1, even assuming there was error, we conclude that it was harmless. Error in the submission of an issue generally is deemed to be harmless when the findings of the jury in answer to other issues are sufficient to support the judgment. *Hatfield v. Sexton*, 316 S.W.3d 50, 63 (Tex. App.—Houston 2010, no pet.). An exception to this rule exists when the charge error confuses the jury as to all of the issues or theories that are sufficient to support the judgment. *Id.* Boardwalk did not elect recovery on its breach of fiduciary duty claims. The damages awarded in the judgment are those found by the jury on the cause of action under the TTLA. The definitions and instructions for the theft questions were separate from the definitions and

---

[17] While Boardwalk's argument does not address the problem of failing to segregate damages by plaintiff, at least one court has concluded that there was no abuse of discretion in submitting the plaintiffs jointly where no claim or cause of action was asserted severally, and no plaintiff claimed damages in separate sums on the alleged causes of action. *See Playboy Enterprises, Inc. v. Editorial Caballero, S.A. de C.V.*, 202 S.W.3d 250, 268–69 (Tex. App.—Corpus Christi 2006, pet. denied). In any event, because appellants' objections to the charge and their briefing on appeal address only the *Casteel* and *Harris County* issues, we do not consider the matter further.

instructions to be applied regarding breach of fiduciary duty. We conclude that any confusion on the part of the jury regarding breaches of fiduciary duty by the five individuals would not affect the jury's consideration of appellants' liability under the TTLA. After reviewing the entire record, we conclude that even if the fiduciary duty instructions were erroneous, this error did not cause rendition of an improper judgment. *Id.* We overrule Critcher's seventh, eighth, ninth, and tenth issues.

### ATTORNEY'S FEES

In their fourth issue, appellants complain that Boardwalk failed to segregate recoverable attorney's fees and was awarded attorney's fees for claims ultimately not pursued at trial. Critcher adopts these arguments in his eleventh and twelfth issues. Specifically, appellants argue Boardwalk's original complaint was for the theft of 256 cars, but by the date of trial that number had been reduced to eleven. Appellants complain the trial court's award of attorney's fees encompasses not only the eleven cars, but also the fees for the entire original claim for the theft of 256 cars. Appellants concede Boardwalk segregated the fees for its TTLA claim from those incurred for its other claims.

The cases cited by appellants require segregation of attorney's fees between claims for which fees are recoverable and claims for which they are not. *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 313–14 (Tex. 2006) (if any attorney's fees relate solely to claim for which such fees are unrecoverable, segregation required unless "discrete legal services advance both a recoverable and unrecoverable claim"); *see also McCalla v. Ski River Dev., Inc.*, 239 S.W.3d 374, 384–85 (Tex. App.—Waco 2007, no pet.) (following *Chapa* and concluding that fees for Declaratory Judgment Act counterclaim must be segregated from fees for tortious interference counterclaim). These cases do not discuss segregation of fees within a particular claim or cause of action.

In their reply brief, appellants also cite *Moak v. Huff*, No. 04-11-00184-CV, 2012 WL 566140 (Tex. App.—San Antonio Feb. 15, 2012, no pet.) (mem. op.), for the proposition that "if a party only recovers for a fraction of the claims asserted under the [TTLA], that party is only allowed to recover for the successful claims." In *Moak*, Huff sued Moak under the TTLA, and for breach of contract, fraud, conversion, and deceptive trade practices. *Id.* at *1. The trial court ruled in Moak's favor on the TTLA claim, and in Huff's favor on the remaining claims, and did not award Moak attorney's fees. *Id.* On appeal, the court stated "[t]he award of fees to a prevailing party in a TTLA action is mandatory." *Id.* at *10. Therefore, Moak could recover her fees for her successful defense of the TTLA claim, even though Huff prevailed on the remaining claims. *Id.* at *11. However, Moak was required to segregate "the fees incurred defending the TTLA claim from those relating to the other causes of action." *See id.* at *12. Because she did not do so, but did offer some evidence of her fees, the case was remanded for a new trial on her attorney's fees for defending the TTLA claim. *Id.* The court did not require segregation of fees within the TTLA claim, however. *See generally id.* at *11–12.

Appellants' cases do not stand for the proposition that fees must be segregated among individual facts in a single TTLA claim, nor for the additional proposition Critcher argues, that segregation is required for "fees incurred because of valid assertions of discovery abuse from fees incurred because of invalid or unsuccessful assertions of discovery abuse." We overrule appellants' fourth issue and Critcher's eleventh and twelfth issues.

### CONCLUSION

Having overruled appellants' seventeen issues, we affirm the trial court's judgment.

111119F.P05

/Molly Francis/
_____
MOLLY FRANCIS
JUSTICE

–43–



# Court of Appeals
## Fifth District of Texas at Dallas

## JUDGMENT

Imagine Automotive Group, Imagine Automotive Group, I., L.P., eCarLink, L.P., eCarLink GP, Inc., Brett Stacy, and Len Critcher, Appellants

No. 05-11-01119-CV          V.

Boardwalk Motor Cars, Ltd. d/b/a Boardwalk Porsche, Boardwalk Automobiles, Ltd. d/b/a Boardwalk Audi, and Boardwalk Transportation, L.P. d/b/a Boardwalk Volkswagen, Appellees

On Appeal from the 296th Judicial District Court, Collin County, Texas
Trial Court Cause No. 296-982-07.
Opinion delivered by Justice Francis. Justices FitzGerald and Fillmore participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellees Boardwalk Motor Cars, Ltd. d/b/a Boardwalk Porsche, Boardwalk Automobiles, Ltd. d/b/a Boardwalk Audi, and Boardwalk Transportation, L.P. d/b/a Boardwalk Volkswagen recover their costs of this appeal and the full amount of the trial court's judgment from appellants Imagine Automotive Group, Imagine Automotive Group, I., L.P., eCarLink, L.P., eCarLink GP, Inc., Brett Stacy, and Len Critcher and from the cash deposit in lieu of cost bond. After all costs have been paid, the clerk of the Collin County District Court is directed to release the balance, if any, of the cash deposit to appellants.

Judgment entered May 7, 2014

/Molly Francis/
MOLLY FRANCIS
JUSTICE